**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) | MDL No. 2:18-mn-2873-RMG<br><br>**This Document Relates to Case No. 20-cv-02115-RMG** |

<u>**MEMORANDUM OF LAW IN SUPPORT OF NEW MEXICO'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DEFENDANTS' CERCLA LIABILITY PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

NATURE OF THE CASE ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................... 2

SUMMARY JUDGMENT STANDARD ............................................................................ 5

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................... 7

ARGUMENT ..................................................................................................................... 8

   I.    Cannon is a "Facility" as Defined in CERCLA ...................................................... 10

   II.   Releases of Hazardous Substances Have Occurred at Cannon .................................. 11

   III.  The United States and the Air Force are Persons Liable under Section 107 .............. 14

   IV.  New Mexico Has Incurred Recoverable Costs ........................................................ 15

       A.  Costs to Monitor, Assess, and Evaluate PFAS Releases at and from Cannon ..... 17

       B.  Costs for Highland Dairy Removal Action ........................................................ 18

       C.  Costs for State Oversight of Defendants' Response ........................................... 20

       D.  Costs for a Health Assessment .......................................................................... 22

       E.  Costs for Natural Resource Damage Assessment ............................................... 23

CONCLUSION ................................................................................................................. 24

## TABLE OF AUTHORITIES

Page(s)

### Federal Cases

*Amoco Oil Co. v. Borden, Inc.*,
   889 F.2d 664 (5th Cir. 1989) ...................................................................... 5, 9

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...................................................................................... 7

*Burlington N. & Santa Fe Ry. Co. v. United States*,
   556 U.S. 599 (2009) .................................................................................. 6, 9

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...................................................................................... 6

*City of New York v. Exxon Corp.*,
   633 F. Supp. 609 (S.D.N.Y. 1986) ............................................................. 20

*Gill v. Rollins Protective Servs. Co.*,
   773 F.2d 592 (4th Cir. 1985) ........................................................................ 6

*Limehouse v. Resol. Tr. Corp.*,
   862 F. Supp. 97 (D.S.C. 1994) ..................................................................... 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ...................................................................................... 7

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
   596 F.3d 112 (2d Cir. 2010) ................................................................... 6, 22

*Pettengill v. United States*,
   867 F. Supp. 380 (E.D. Va. 1994) ............................................................... 6

*Phillips v. CSX Transp., Inc.*,
   190 F.3d 285 (4th Cir. 1999) ........................................................................ 7

*Stanton Rd. Assocs. v. Lohrey Enterprises*,
   984 F.2d 1015 (9th Cir. 1993) .................................................................... 15

*State of Cal. on Behalf of Cal. Dep't of Toxic Substances Control v.Celtor Chem. Corp.*,
   901 F. Supp. 1481 (N.D. Cal. 1995) .......................................................... 22

*Thompson v. Potomac Elec. Power Co.*,
    312 F.3d 645 (4th Cir. 2002) ................................................................ 7

*United States v. Alcan Aluminum Corp.*,
    964 F.2d 252 (3d Cir. 1992)........................................................ 11, 13

*United States v. Bogas*,
    920 F.2d 363 (6th Cir. 1990) .................................................... 17, 18

*United States v. E.I. Dupont De Nemours & Co. Inc.*,
    432 F.3d 161 (3d Cir. 2005)........................................................ 20

*United States v. Hardage*,
    761 F. Supp. 1501 (W.D. Okla. 1990) ...................................... 9, 11, 14

*United States v. Hardage*,
    982 F.2d 1436 (10th Cir. 1992) ............................................... 9, 16, 20

*United States v. Lowe*,
    118 F.3d 399 (5th Cir. 1997) .................................................... 19

*United States v. Medley*,
    17 Envtl.L.Rep. 20297 (D.S.C. 1986)........................................ 5, 16

*United States v. Monsanto Co.*,
    858 F.2d 160 (4th Cir. 1988) .................................................... 8, 9

*United States v. Northeastern Pharmaceutical & Chemical Co. (NEPACCO)*,
    810 F.2d 726 (8th Cir. 1986) .................................................... 9, 16

*United States v. R.W. Meyer, Inc.*,
    889 F.2d 1497 (6th Cir. 1989) .................................................. 5, 18

*United States v. Rohm and Haas Company*,
    2 F.3d 1265 (3d Cir. 1993).......................................................... 21

*United States v. S.C. Recycling & Disposal, Inc.*,
    653 F. Supp. 984 (D.S.C. 1984)................................................ 5

*United States v. W. Processing Co.*,
    734 F. Supp. 930 (W.D. Wash. 1990) ...................................... 16

### State Cases

*Sanders-Reed ex rel. Sanders-Reed v. Martinez*,
    350 P.3d 1221 (N.M. Ct. App. 2015) ........................................ 24

iii

## Federal Statutes

10 U.S.C. § 2705(b) ............................................................................................ 21
42 U.S.C. § 6901 ................................................................................................. 1
42 U.S.C. § 9601(16) .......................................................................................... 24
42 U.S.C. § 9601(21) .......................................................................................... 14
42 U.S.C. § 9601(22) .......................................................................................... 11
42 U.S.C. § 9601(23) ................................................................. 15, 17, 18, 19, 23
42 U.S.C. § 9601(25) .......................................................................................... 15
42 U.S.C. § 9601(29) .......................................................................................... 11
42 U.S.C. § 9601(9) ......................................................................................... 9, 10
42 U.S.C. § 9604(i) .......................................................................................... 8, 23
42 U.S.C. § 9607(a) ................................................................. 4, 8, 14, 16, 23
42 U.S.C § 9607(b) ......................................................................................... 9, 10
42 U.S.C. § 9607(f) ............................................................................................ 24
42 U.S.C. § 9613(f) ............................................................................................. 9
42 U.S.C. § 9613(g)(2) ......................................................................... 15, 23, 25
42 U.S.C. § 9620(a)(1) ....................................................................................... 10
42 U.S.C. § 9621(f)(1) ....................................................................................... 21

## State Statutes

NMSA § 75-7-2 ................................................................................................... 24
NMSA 1978, § 74-4 ......................................................................................... 1, 19

## Federal Rules

Fed. R. Civ. P. 56 ............................................................................................. 6, 7

## Federal Regulations

40 C.F.R. § 141 .................................................................................................. 14
40 C.F.R. § 302.4 ................................................................................................ 4
43 C.F.R. § 11.15(a) ........................................................................................... 24
43 C.F.R. § 11.23 ............................................................................................... 24
89 Fed. Reg. 32532 ............................................................................................ 13
89 Fed. Reg. 39124 ............................................................................................. 4
89 Fed. Reg. 8606 ............................................................................................... 3

In support of their Motion for Partial Summary Judgment as to Defendants' CERCLA Liability, Plaintiffs submit this Memorandum of Law and Exhibit A, a Declaration executed by undersigned counsel Allan Kanner ("Kanner Decl."), along with additional Exhibits thereto. As set forth herein, there can be no genuine dispute of material fact as to any of the elements of CERCLA liability, and New Mexico is entitled to judgement as a matter of law. Thus, the Motion should be granted.

## NATURE OF THE CASE

This is an action under Section 107 of CERCLA. In this Motion for Partial Summary Judgment, New Mexico seeks solely to establish that the United States and the Air Force are liable under Section 107 for the State's response costs arising from the contamination of Cannon Air Force Base with the hazardous substances PFOA and PFOS, due to their ownership and operation of the base both now and at the time of release.[1]

For decades, the Air Force has utilized aqueous film-forming foam ("AFFF") in firefighting and fire training exercises at Cannon, located in Curry County approximately three miles east of Clovis, New Mexico. As a result of a multitude of releases at the site—both historic and recent—Cannon and its surrounding environment have been severely contaminated with per- and poly-fluoroalkyl substances ("PFAS"), including PFOA and PFOS, which are contained in AFFF and have been designated as "hazardous substances" under CERCLA by the Environmental Protection Agency ("EPA"). PFOA and PFOS have been detected at extremely high levels at

---

[1] New Mexico's Second Amended Complaint also asserts causes of action under the New Mexico Hazardous Waste Act, NMSA 1978, §§ 74-4-1 to -14, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq*. Second Am. Compl. ¶¶ 219-34. Likewise, the Complaint alleges CERCLA liability at four additional military bases in New Mexico, in addition to Cannon (Holloman Air Force Base, Kirtland Air Force Base, White Sands Missile Range, and Fort Wingate). However, this Motion is limited to the State's claims under CERCLA applicable to Cannon Air Force Base. *Id.* at ¶¶ 235-45.

1

Cannon, both on and off the base, and are known to have contaminated the underlying Ogallala aquifer—the sole drinking water source for the region.

As a result, and as described below, New Mexico has incurred substantial and foreseeable costs responding to the contamination and will incur additional such costs in the future. Natural resources which the State holds in trust (most notably, groundwater) have also been damaged, the extent of which is currently being assessed. Section 107 imposes liability for response costs on the owner and operator of a site contaminated with hazardous substances, without regard to fault or the existence of other potentially responsible parties. There can be no reasonable dispute as to the facts material to Defendants' liability under Section 107, and New Mexico is entitled to judgment as a matter of law. Thus, this Court should grant New Mexico's Motion for Partial Summary Judgment as to Defendants' CERCLA Liability.

## **FACTUAL AND PROCEDURAL BACKGROUND**

In March of 2019, New Mexico filed this action in the United States District Court for the District of New Mexico. As originally filed, the Complaint alleged that Defendants had released PFAS into the environment at and around two Air Force bases in the State—Cannon Air Force Base and Holloman Air Force Base—and that said releases pose or may pose an imminent and substantial endangerment to public health and the environment in violation of the New Mexico Hazardous Waste Act ("NMHWA"). Later that year, the State amended its Complaint to add an analogous cause of action under the federal Resource Conservation and Recovery Act ("RCRA").

In February of 2020, New Mexico's action was transferred to this Court by the Judicial Panel on Multidistrict Litigation. Conditional Transfer Order (CTO-26) (Dkt. No. 603). While the State's case has been pending before this Court, the contamination at Cannon has continued to spread in a groundwater plume that now stretches over three miles off-base. *See infra* at Section

II.

The Air Force's response to the contamination at Cannon has been both slow and inadequate. *See* Mem. of Law in Opp. to the United States' Site-Specific Mot. to Dismiss, at 18 (Dkt. No. 4851). As a result, New Mexico has expended large sums responding to the contamination itself, as detailed in the State's Complaint.[2] Second Am. Compl. ¶ 111, 113 (Case No. 2:20-cv-02115, Dkt. No. 115). Specifically, New Mexico has: (1) investigated PFAS contamination at and around the base, and in the Ogallala aquifer; (2) funded a removal plan to safely dispose of contaminated cattle at an off-base dairy farm; (3) overseen and commented on the Air Force's response actions; (4) begun a health assessment for residents living at or near Cannon; and (5) begun assessing natural resource damages at and around the facility. *Id.*

Notably, the State's costs in responding to PFAS contamination at Cannon would likely have been far fewer—or potentially non-existent—had the Air Force been willing to work cooperatively with the State in responding to the contamination.[3] Unfortunately, as detailed in other briefing submitted to this Court, the Air Force has refused to do so. *See* Mem. of Law in Opp. to the United States' Site-Specific Mot. to Dismiss, at 17-18 (Dkt. No. 4851). Thus, New Mexico has been forced to take independent action to address PFAS contamination at and around Cannon, at significant cost to its taxpayers.

In May of 2024, the EPA designated PFOA and PFOS as "hazardous substances" under

---

[2] New Mexico is a national leader on PFAS issues. *See*, *e.g.*, *Listing of Specific PFAS as Hazardous Constituents*, 89 Fed. Reg. 8606, 8609 (proposed February 8, 2024) (noting that the action was in response to a petition submitted by New Mexico Governor Michelle Lujan Grisham).

[3] As detailed in other briefing to this Court, the Air Force is actually obligated to respond to PFAS contamination at Cannon under the State's oversight, pursuant to a 2018 permit entered into by Defendants under RCRA and the NMHWA. *See* Mem. of Law in Opp. to the United States' Site-Specific Mot. to Dismiss, at 8-9 (Dkt. No. 4851); *see also infra* at Section IV(C). But even setting aside the State's authority under RCRA to oversee the cleanup at Cannon, federal/state cooperation is intended (and required) by both CERCLA and the Defense Environmental Restoration Program ("DERP"). *See infra* at Section IV(C).

3

CERCLA. *Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*, 89 Fed. Reg. 39124 (May 8, 2024) (codified at 40 C.F.R. § 302.4).[4] Importantly, that designation created causes of action under Section 107 of CERCLA against polluters of PFOA and PFOS, making them liable for, as relevant here: (1) the cost of all response actions taken by a state (*i.e.*, costs of removal or remedial actions) not inconsistent with the National Contingency Plan ("NCP"); (2) natural resource damages and the cost of assessing such damages; and (3) certain health assessments. 42 U.S.C. § 9607(a)(4)(A), (C), (D). In response to this landmark regulatory shift,[5] and after the United States informed the Court that it was potentially liable under Section 107,[6] New Mexico amended its Complaint to assert a cause of action under Section 107 with leave of this Court. *See* Second Am. Compl. (Case No. 2:20-cv-02115-RMG, Dkt. No. 115). New Mexico was the first party in this MDL (and, on information and belief, outside it) to assert a cause of action under CERCLA in response to the designation of PFOA and PFOS as hazardous substances, seeking leave to amend its Complaint the day the rule became effective. Dkt. No. 5277 (filed July 8, 2024).

---

[4] Contrary to the United States' suggestions at the June 20, 2025 Status Conference, there is no indication that the EPA will rescind the designation, or otherwise alter the status of PFOA and PFOS as "hazardous substances." Quite the opposite, in fact.

EPA *has* indicated that it may alter the regulation of some PFAS under a different federal law—the Safe Drinking Water Act. *See* EPA, *EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS* (May 14, 2025), https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos. But the agency has repeatedly stated its support for "polluter pays" principles with regards to PFAS, a reference to CERCLA's statutory scheme. *Id.; see also* EPA, *Administrator Zeldin Announces Major EPA Actions to Combat PFAS Contamination* (April 28, 2025), https://www.epa.gov/newsreleases/administrator-zeldin-announces-major-epa-actions-combat-pfas-contamination. Indeed, in its justification for its 2026 budget proposal to Congress, EPA noted its intent to use CERCLA authorities to address PFAS at contaminated sites around the country. EPA, *FY 2026: EPA Budget in Brief* (May 2025), https://www.epa.gov/system/files/documents/2025-05/fy-2026-epa-bib.pdf.

[5] The significance of this rulemaking by EPA has been noted by this Court. April 25, 2024 Status Conference Tr. at 43 ("[T]he universe has changed now.") and 54 ("[I]t strikes me that a study about how we can maximize CERCLA reimbursements is probably the highest and best use of our time right now.").

[6] April 25, 2024 Status Conference Tr. at 41-42 ("THE COURT: So is the United States recognizing that there may be valid claims under CERCLA now? MS FALK: Absolutely, Your Honor . . .").

4

Since the filing of its Second Amended Complaint, New Mexico has engaged in good faith negotiations with the Department of Justice ("DOJ"), seeking to resolve the liability for which this Motion seeks judgment. The State submitted a demand letter to DOJ on September 4, 2024, itemizing response costs in detail and providing voluminous supporting documentation (as requested by DOJ).[7] The United States responded to New Mexico's demand on January 31, 2025. In its response, the United States seemingly accepts certain categories of the State's costs as recoverable under Section 107 (subject to additional documentation of some costs, which is ongoing), while rejecting others.

On February 13, 2025, New Mexico proposed to DOJ that the United States stipulate to liability, obviating the need for this Motion. However, DOJ refused. The following day New Mexico inquired whether DOJ would be willing to stipulate more narrowly (to certain elements of liability) and also inquired whether the United States would be willing to enter a partial settlement for those costs which were seemingly agreed to be recoverable, and were fully documented. DOJ failed to respond. Accordingly, Plaintiffs bring this Motion.

## SUMMARY JUDGMENT STANDARD

Partial summary judgment is "an appropriate procedure whereby a court can narrow the scope of trial." *Limehouse v. Resol. Tr. Corp.*, 862 F. Supp. 97, 102 (D.S.C. 1994). CERCLA plaintiffs—including the United States—commonly seek partial summary judgment to establish liability under Section 107. *E.g.*, *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989); *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1505 (6th Cir. 1989); *United States v. Medley*, 17 Envtl.L.Rep. 20297, 20297 (D.S.C. 1986); *United States v. S.C. Recycling & Disposal, Inc.*, 653

---

[7] New Mexico was one of only four plaintiffs to do so at the time—a deliberative process recommended by the Court to "get the system up and going [and] get the understanding from [DOJ], what are you going to need to prove your claim[.]" April 25, 2024 Status Conference Tr. at 49.

F. Supp. 984 (D.S.C. 1984). This accords with the goals of the Federal Rules of Civil Procedure to secure a "just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citations omitted). It also furthers the goals of CERCLA, which was intended "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts are borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). With this Motion, New Mexico seeks to establish the liability of the Defendants under Section 107, which would leave the quantum of costs and damages to be negotiated, or litigated at a later time if no resolution can be reached. *See Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 131 (2d Cir. 2010) ("In practice, courts generally bifurcate a CERCLA proceeding, determining liability in Phase I, and then apportioning recovery in Phase II.").

"A motion for partial summary judgment utilizes the same standards required for consideration of a full motion for summary judgment." *Pettengill v. United States*, 867 F. Supp. 380 (E.D. Va. 1994) (citing *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985), *amended* 788 F.2d 1042 (4th Cir. 1986)). To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [which] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." *Celotex*, 477 U.S. at 322-23 & n.4 (citing Rule 56(c)).

Where the moving party has met its burden to put forth sufficient evidence to demonstrate there is no genuine dispute of material fact, the non-moving party must come forth with "specific

facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Rule 56(e)). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. **Cannon is a "facility" as defined in CERCLA**. Site Inspection Report, AF09-00001075 at 1097 (site description) (Exhibit ("Ex.") 1 to the Kanner Decl.); *id.* at 1107-27, 1135-39, 1146, and 1151-78 (demonstrating that the hazardous substances PFOA and PFOS have come to be located at Cannon).

2. **AFFF used by the Air Force contained the hazardous substances PFOA and/or PFOS.** Site Inspection Report at 1091 ("The [Air Force] began purchasing and using AFFF containing PFAS ([PFOS] and/or [PFOA]) . . . in 1970, as confirmed by the following federal government documents . . . .") (Ex. 1 to the Kanner Decl.).

3. **There have been numerous releases of AFFF at Cannon by the Air Force.** *Id.* at 1107-27 (discussing detections of PFOA and PFOS at Cannon), 1135-39 (summary of analytical results), 1146 (map of AFFF Release Areas), and 1151-78 (maps annotated with detections); Preliminary Assessment Report, FF_AF15-00072186 at 72270-76 (discussing numerous releases) and 72404-08 (spreadsheet of documented releases) (Ex. 2 to the Kanner Decl.); August 14, 2018 Written Notice of Release, FF_AF15-00041829 (notifying the State of historic releases) (Ex. 3 to the Kanner Decl.); Cannon Letter Dated August 30, 2024 (notifying the State of a recent release) (Ex. 4 to the Kanner Decl.).

4. **The United States and the Air Force are the current owners/operators of Cannon.** Site Inspection Report at 1097 (site history) (Ex. 1 to the Kanner Decl.).

5. **The United States and the Air Force were the owners and operators of Cannon at the time of the release of hazardous substances.** *Id.* (noting ownership/operation by the United States since 1929, and ownership/operation by the Air Force since 1951).

6. **New Mexico has incurred response costs due to the releases of hazardous substances at Cannon.** Second Am. Compl. ¶ 111 (Case No. 2:20-cv-02115, Dkt. No. 115); Supplemental Plaintiff Fact Sheet – State of New Mexico, et al., at 8-9 (noting removal actions taken by the State at Cannon and their cost) (Ex. 5 to the Kanner Decl.); Phase 1

PFAS Investigation Report, NM-AFFF-00000239 (Ex. 6 to the Kanner Decl.); Phase 2 PFAS Investigation Report, NM-AFFF-00000734 (Ex. 7 to the Kanner Decl.); Exemplar DBS&A Invoice and Proof of Payment (Ex. 8 to the Kanner Decl.); PFAS Sampling Interim Report (Ex. 9 to the Kanner Decl.); USGS Mem. of Agreement (Ex. 10 to the Kanner Decl.); Exemplar USGS Invoice and Proof of Payment (Ex. 11 to the Kanner Decl.); Exemplar Hall Environmental Invoice and Proof of Payment (Ex. 12 to the Kanner Decl.); Depopulation and Removal Plan for Highland Dairy Cow Herd, NM-AFFF-00000858 (Ex. 13 to the Kanner Decl.); Highland Dairy Application for Funding (Ex. 14 to the Kanner Decl.); Approved Request for Release of Hazardous Waste Emergency Funds (Ex. 15 to the Kanner Decl.); Highland Dairy Invoice and Proof of Payment (Ex. 16 to the Kanner Decl.); NMED Response to Site Investigation Report (Ex. 17 to the Kanner Decl.); NMED Response to Remedial Investigation Work Plan (Ex. 18 to the Kanner Decl.); NMED Request for Information (Ex. 19 to the Kanner Decl.); NMED News Release (Ex. 20 to the Kanner Decl.); Professional Services Contract with ESG (Ex. 21 to the Kanner Decl.); Purchase Order for ESG Health Assessment (Ex. 22 to the Kanner Decl.) Exemplar Abt Invoice and Proof of Payment (Ex. 23 to the Kanner Decl.); NRD Preassessment Screen at 43-44 (Ex. 24 to the Kanner Decl.).

## **ARGUMENT**

Section 107 makes four classes of persons liable: (1) the current owner and/or operator of a site where hazardous substances have been released; (2) the owner and/or operator of the site when the hazardous substances were released; (3) any person who has arranged for the disposal of hazardous substances at the site; and (4) any person who has transported hazardous substances to the site for disposal. 42 U.S.C. § 9607(a)(1)-(4). Such persons are liable for (A) "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the [NCP]"; (B) "any other necessary costs of response incurred by any other person consistent with the [NCP]"; (C) "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release"; and (D) "the costs of any health assessment or health effects study carried out under [42 U.S.C. § 9604(i)]." *Id.* § 9607(a)(4)(A)-(D).

Importantly, Section 107 imposes strict, joint, and several liability. *United States v. Monsanto Co.*, 858 F.2d 160, 167 & n.11 (4th Cir. 1988) ("[T]he overwhelming body of precedent

8

. . . has interpreted [CERCLA] as establishing a strict liability scheme."); *id.* at 171-72 (stating that liability is joint and several in cases of indivisible harm).[8] Thus, in the context of a motion for partial summary judgment as to liability under Section 107, sovereign plaintiffs like New Mexico are only required to demonstrate that:

> (1) the site at issue is a "facility" as defined in CERCLA, 42 U.S.C. § 9601(9);
> (2) a release or threatened release of "hazardous substances" under CERCLA has occurred or is occurring at the site;
> (3) the defendants fall within one of the classes of liable persons described in Section 107; and
> (4) the release or threatened release has caused the sovereign plaintiff to incur response costs.[9]

*E.g.*, *United States v. Hardage*, 761 F. Supp. 1501, 1508-09 (W.D. Okla. 1990) ("If the United States establishes each of these elements and the defendants are unable to prove the applicability of one of the defenses listed under section 9607(b), or some other applicable defense, the United States is entitled to summary judgment on the liability issue.") (citing *Amoco Oil*, 889 F.2d at 668).

In reports commissioned and adopted by Defendants, which are available both in Cannon's administrative record and in this Court's record, the United States has admitted the first three elements of Section 107 liability. Regarding the last element (New Mexico's incurrence of response costs), the fact that the State has incurred some amount of recoverable response costs is not reasonably disputable, and is demonstrated by documents attached to this Motion. The United

---

[8] While liability here is joint and several due to the indivisible nature of PFAS contamination at and around Cannon, the Defendants *may* have a claim for contribution from additional parties made liable by Section 107. *See* 42 U.S.C. § 9613(f). However, Defendants may pursue such claims, if any (none are known to the State), in a separate or subsequent action. *Id.* § 9613(f)(1) (persons liable under Section 107 may seek contribution "during *or following*" an action under Section 107) (emphasis added); *see also Monsanto*, 858 F.2d at 172-73. Such a procedural sequence furthers CERCLA's goal "to promote the timely cleanup of hazardous waste sites." *Burlington*, 556 U.S. at 602.

[9] Notably, unlike private party plaintiffs, a sovereign plaintiff (the United States, a state, or a tribe) is not required to show that its response costs are consistent with the NCP. Consistency is presumed, and defendants carry the burden of proof to rebut that presumption by showing that the selected action for which the cost was incurred was arbitrary and capricious. *E.g.*, *Hardage*, 982 F.2d at 1442 (10th Cir. 1992) (citing CERCLA's statutory language and adopting the holding of *United States v. Northeastern Pharmaceutical & Chemical Co. (NEPACCO)*, 810 F.2d 726 (8th Cir. 1986), *cert. denied*, 484 U.S. 848 (1987)).

9

States has waived sovereign immunity, 42 U.S.C. § 9620(a)(1), none of the statutory defenses apply, *see id.* § 9607(b) (act of God, act of war, act/omission of third party), nor do any of the exceptions to Section 107 liability, *see id.* § 9607(d) and (o)-(r). Thus, given CERCLA's statutory scheme and the lack of genuine dispute regarding the material facts, as a matter of law New Mexico is entitled to a finding that the United States and Air Force are liable under Section 107, and New Mexico's Motion should be granted.

### I.     Cannon is a "Facility" as Defined in CERCLA

There can be no dispute that Cannon is a "facility" within the meaning of CERCLA. CERCLA provides that

> [t]he term "facility" means (A) any building, structure, *installation*, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, *or* (B) *any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located*; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9) (emphases added). It is beyond dispute that Cannon is an "installation." Indeed, the United States itself uses that word to describe it: "Cannon AFB is located in eastern New Mexico . . . The *installation* encompasses approximately 3,789 acres . . . ." Site Inspection Report at 1097 (Ex. 1 to the Kanner Decl.) (emphasis added).

Equally indisputable, Cannon is also a "facility" within the meaning of CERCLA because it is a site or area where hazardous substances were disposed of or have otherwise come to be located. *See* 42 U.S.C. § 9601(9)(B). As detailed in the Preliminary Assessment Report, AFFF containing the hazardous substances PFOA and PFOS was stored and used by the Air Force at

Cannon since 1970, which often resulted in releases into the environment (*i.e.* disposal).[10]
Preliminary Assessment Report at 72270-76 (discussing numerous releases) and 72404-08
(spreadsheet of documented releases) (Ex. 2 to the Kanner Decl.). As a result, both PFOA and
PFOS have been detected at numerous areas at the base. Site Inspection Report at 1107-27
(discussing detections of PFOA and PFOS at Cannon), 1135-39 (summary of analytical results),
and 1151-78 (maps annotated with detections) (Ex. 1 to the Kanner Decl.); *see also infra* at Section
II.

Because Cannon is an "installation" and/or because it is a site or area where hazardous
substances have come to be located, Cannon is a "facility" within the meaning of CERCLA, thus
satisfying the first element of liability under Section 107.

## II.     Releases of Hazardous Substances Have Occurred at Cannon

There likewise can be no dispute that releases of the hazardous substances PFOA and PFOS
into the environment have occurred at Cannon.

CERCLA defines "release" broadly as "any spilling, leaking, pumping, pouring, emitting,
emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."
42 U.S.C. § 9601(22). Moreover, a plaintiff under Section 107 need merely show the *presence* of
hazardous substances in the environment in order to establish that a "release" has occurred. *E.g.*,
*United States v. Hardage*, 761 F.Supp. at 1510 ("The presence of hazardous substances in the soil,
surface water, or groundwater of a site demonstrates a release.") (citation omitted). There is no
quantitative or threshold concentration requirement. *United States v. Alcan Aluminum Corp.*, 964

---

[10] CERCLA incorporates RCRA's definition of "disposal," which defines it as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 9601(29); *id.* § 6903(3) (RCRA definition).

F.2d 252, 259-61 (3d Cir. 1992) (noting that the statute imposes no such requirement, legislative history confirms it, and that almost every court to have considered the issue has so held).

The Air Force's Preliminary Assessment Report extensively documents spills and discharges of AFFF (containing the hazardous substances PFOA and PFOS) into the environment at Cannon. For example, the Air Force found that

> [t]here are four former [Fire Training Areas] present at Cannon AFB . . . FT-07, FT-08, and FTA-4 were all operational during or after 1970, and the Cannon AFB Fire Department likely used AFFF at those FTAs during fire training exercises. The exact quantity of AFFF used at the former FTAs is unknown. However, the exercise areas and runoff pits at the former FTAs were all unlined. As such, any substances used there would have likely permeated into the soil.

Preliminary Assessment Report at 72270 (Ex. 2 to the Kanner Decl.). The Air Force subsequently confirmed such releases, detecting PFAS contamination at these (and other) areas. Site Inspection Report at 1107-27 (discussing detections of PFOA and PFOS at Cannon), 1135-39 (summary of analytical results), and 1151-78 (maps annotated with detections) (Ex. 1 to the Kanner Decl.).

The Air Force further found that there were "documented releases of AFFF" at all nine hangers at Cannon equipped with AFFF fire suppression systems, that three other areas (the former Sewage Lagoons, North Playa Lake, and the Whispering Wind Gold Course) were potential release areas given that they received Cannon's wastewater, and that the South Playa Lake was a potential release area due to stormwater runoff. Preliminary Assessment Report at 72270-71 (Ex. 2 to the Kanner Decl.). Again, these findings were confirmed through the detection of PFOA and PFOS at those locations. *See* Site Inspection Report at 1107-27 (discussing detections of PFOA and PFOS at Cannon), 1135-39 (summary of analytical results), 1146 (map of AFFF Release Areas), and 1151-78 (maps annotated with detections) (Ex. 1 to the Kanner Decl.).

Indeed, shortly after finalization of the Site Inspection Report, the Air Force notified the State regarding the "[r]elease/detection of [AFFF] at Cannon AFB containing perfluorinated

compounds PFOS and PFOA impacting groundwater" and that "[h]istoric fire fighter training activities are the probable source of the release." August 14, 2018 Written Notice of Release, (Ex. 3 to the Kanner Decl.). But not all releases of PFAS at Cannon are historic. Most recently, in August of last year the Air Force reported to the State regarding a "release of PFAS-containing liquid" at Cannon's active Fire Training Area, resulting from the "improper disposal" of 7,300 gallons of rinsate containing AFFF that occurred in July of 2024. Cannon Letter Dated August 30, 2024 (Ex. 4 to the Kanner Decl.). In August of 2024, the Air Force learned that the liner of the disposal site (a retention pond) was torn in over a dozen locations. *Id.* While the Air Force was unable to state the estimated volume of the release, it did report that personnel were only able to recover 3,600 of the 7,300 gallons disposed of at the site (presumably meaning that 3,700 gallons was released into the environment). *Id.*

It is indisputable that due to historic and continuing releases of AFFF at Cannon, numerous areas of the base have been contaminated with the hazardous substances PFOA and PFOS. Site Inspection Report at 1107-27 (discussing detections of PFOA and PFOS at Cannon), 1135-39 (summary of analytical results), 1146 (map of AFFF Release Areas), and 1151-78 (maps annotated with detections) (Ex. 1 to the Kanner Decl.). Indeed, the Site Inspection Report found that PFOS and/or PFOA were present at every single area sampled. *Id.* at 1135-39.[11] The results of groundwater testing were particularly dire: PFOA and PFOS were detected at 26,200 parts per trillion ("ppt")—6,550 times the recently promulgated drinking water standards for those substances. *Id.; PFAS National Primary Drinking Water Regulation*, 89 Fed. Reg. 32532 (codified

---

[11] While the Site Inspection Report recommended site close-out ("No Further Remedial Action Planned" or "NFRAP") at locations that did not exceed the screening levels utilized by the Air Force, as noted above there is no quantitative threshold level of contamination required for CERCLA liability to attach. *E.g.*, *Alcan Aluminum*, 964 F.2d at 257-59 (3d Cir. 1992).

at 40 C.F.R. § 141) (establishing an MCL of 4 ppt for both PFOA and PFOS). In addition to the numerous documented spills of AFFF into the environment at Cannon, the detection of hazardous substances in the environment at Cannon is sufficient to establish that there has been a "release." *Hardage*, 761 F.Supp. at 1510. Thus, it is an undisputable fact that releases of the hazardous substances PFOA and PFOS have occurred at Cannon, the second element of liability under Section 107.

### III.     The United States and the Air Force are Persons Liable under Section 107

It is also undisputable that both the United States and the Air Force are persons liable under Section 107. CERCLA makes four classes of persons liable, including as relevant here: (1) the current owner and/or operator of the facility; and (2) the owner and/or operator of the facility at the time of the release of hazardous substances. 42 U.S.C. § 9607(a)(1), (2).[12] The United States and the Air Force fall into both these classes with respect to Cannon.

Defendants are the current owners and operators of Cannon, an active Air Force Base. The Air Force's Site Investigation Report notes that while Cannon was established as a civilian passenger terminal in 1929, "[t]he Army Air Corps took control of the civilian airfield in 1942" and that "[t]he installation was reassigned to the Tactical Air Command (TAC) [a former command division of the Air Force] and formally reactivated as Clovis [Air Force Base] in 1951." Site Inspection Report at 1097 (Ex. 1 to the Kanner Decl.).[13] Currently, Cannon hosts the Air Force's 27th Special Operations Wing. *Id.*

Because the United States has owned and/or operated Cannon since 1942, and because the Air Force has owned and/or operated Cannon since 1951, each Defendant is both the current owner

---

[12] CERCLA defines "person" to include the United States. 42 U.S.C. § 9601(21).

[13] The base was renamed "Cannon Air Force Base" in 1957. *Id.*

14

and/or operator of the facility, and the owner and/or operator of the facility at the time of the release

of hazardous substances (which occurred between 1970—when the military began using AFFF—

and as recently as July of last year). *Id.*; Preliminary Assessment Report at 72404-08 (spreadsheet

of documented releases occurring between 1989 and 2014) (Ex. 2 to the Kanner Decl.); Cannon

Letter Dated August 30, 2024 (reporting release of PFAS as recently as July of this year) (Ex. 4 to

the Kanner Decl.). Thus, it is an undisputed fact that the United States and the Air Force are liable

persons under Section 107, the third element of liability.

## IV.  New Mexico Has Incurred Recoverable Costs

It is undisputable that New Mexico has incurred recoverable response costs as a result of

the Air Force's release of PFOA and PFOS into the environment at Cannon.[14] CERCLA defines

"response" as "remove, removal, remedy, and remedial action." *Id.* § 9601(25). "[R]emove" and

"removal" are in turn defined to include

> . . . the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, *such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances*, the disposal of removed material, *or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment*, which may otherwise result from a release or threat of release. . .

42 U.S.C. § 9601(23) (emphases added).

As described both in the State's Complaint and in its Plaintiff Fact Sheet, the State has

taken numerous removal actions, all a direct result of the Defendants' release of hazardous

---

[14] The State will have additional such costs in the future. While Section 107 "requires plaintiffs to actually incur response costs before they can recover them," *Stanton Rd. Assocs. v. Lohrey Enters.*, 984 F.2d 1015, 1021 (9th Cir. 1993), Section 113(g)(2) of CERCLA directs courts hearing a Section 107 action to "enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). New Mexico requests such relief.

substances at Cannon. Second Am. Compl. ¶ 111; Supplemental Plaintiff Fact Sheet – State of New Mexico, et al. at 8-9 (noting removal actions taken by the State at Cannon and their cost) (Ex. 5 to the Kanner Decl.). These actions are likewise described below.

It is important to note that consistency with the NCP is not at issue in this Motion to establish liability: "[C]onsistency or inconsistency with the [NCP] is not an element of whether the government has incurred response costs for the purposes of a motion for summary judgment [on liability]. Consistency with the NCP relates only to the recoverability of various cost items, which the court holds is to be addressed during later proceedings." *United States v. Medley*, 17 Envtl. L. Rep. 20297, 20297 (D.S.C. 1986). *See also United States v. Hardage*, 982 F.2d 1436, 1445 (10th Cir. 1992) ("A defense that the government's response costs are incurred pursuant to response actions that are inconsistent with the NCP is a defense to the recoverability of particular response costs, not a defense to liability for those costs.").[15]

Nor is the amount or quantum of the State's response costs at issue in this Motion. Rather, the State need only prove that *some* amount of costs has been incurred. *E.g.*, *United States v. W. Processing Co.*, 734 F. Supp. 930, 937 (W.D. Wash. 1990) ("The Governments need only show they have incurred *some* response costs.") (emphasis in original). Nevertheless, the State's response actions are described below to demonstrate the indisputable fact that New Mexico has incurred *some* amount of recoverable costs, and thus is entitled to a liability judgment. *Id.*

---

[15] Moreover, as mentioned above, a sovereign plaintiff (the United States, a state, or a tribe) is not required to show that its response costs were consistent with the NCP in order to make out a *prima facie* case under Section 107. *Compare* 42 U.S.C. § 9607(a)(4)(A) *with id.* § 9607(a)(4)(B); *also, e.g.*, *Hardage*, 982 F.2d at 1442 (citing CERCLA's statutory language and adopting the holding of *NEPACCO*, 810 F.2d 726, *cert. denied*, 484 U.S. 848 (1987)). Consistency is presumed, and Defendants carry the burden of proof to rebut that presumption by showing that the selected action for which the cost was incurred was arbitrary and capricious. *Id.*

### A.  Costs to Monitor, Assess, and Evaluate PFAS Releases at and from Cannon

Since first learning of PFAS contamination at Cannon in 2018, the State has incurred significant costs investigating this environmental catastrophe—actions to "monitor, assess, and evaluate the release." 42 U.S.C. § 9601(23); *see also, e.g.*, *United States v. Bogas*, 920 F.2d 363, 369 (6th Cir. 1990) ("Cleanup costs recoverable under CERCLA include not only the direct cost of removal, but of site testing, studies, and similar 'response costs,' direct and indirect.").

For example, the New Mexico Environment Department ("NMED") commissioned a study of the contamination at Cannon and the surrounding area, performed by Daniel B. Stephens & Associates, at a cost to the State of $449,926.94. Phase 1 PFAS Investigation Report (Ex. 6 to the Kanner Decl.); Phase 2 PFAS Investigation Report (Ex. 4 to the Kanner Decl.); Exemplar DBS&A Invoice and Proof of Payment (Ex. 7 to the Kanner Decl.). The purpose of this study was "to quantitatively evaluate the contaminant source and potential migration pathways using a systematic approach through environmental sampling and analysis," to "assist in further characterizing the PFAS release within the study area [Cannon and the surrounding area] by quantifying contaminants of concern (COCs) present in sediment, surface water, and groundwater at and in the vicinity of the release," and to "assist NMED in the selection of a remedy that reduces risks to human health and the environment." Phase 1 PFAS Investigation Report at 249 (Ex. 6 to the Kanner Decl.). This was accomplished in two phases. In the first phase, the State (through its contractor) compiled and reviewed existing documents and data, prepared planning documents, conducted a site visit, installed a monitoring well, and performed site characterization activities. Phase 1 PFAS Investigation Report at 283-95 (Ex. 6 to Kanner Decl.). In the second phase, the State conducted additional groundwater sampling and performed extensive groundwater flow modeling. Phase 2 PFAS Investigation Report at 746-55 (Ex. 7 to the Kanner Decl.).

As another example, NMED has conducted extensive environmental sampling around Cannon, independent of (though discussed in) the study described above. Samples were taken from various locations around Cannon by NMED employees and/or contractors and sent to vendors for environmental analysis, including Hall Environmental Analysis Laboratory and the United States Geological Survey ("USGS"). PFAS Sampling Interim Report (Ex. 9 to the Kanner Decl.); USGS Mem. of Agreement (Ex. 10 to the Kanner Decl.); Exemplar USGS Invoice and Proof of Payment (Ex. 11 to the Kanner Decl.); Exemplar Hall Environmental Invoice and Proof of Payment (Ex. 12 to the Kanner Decl.). Again, these response actions were taken to "monitor, assess, and evaluate the release." 42 U.S.C. § 9601(23); *see also, e.g.*, *Bogas*, 920 F.2d at 369. In addition to informing New Mexico's response to PFAS contamination at Cannon, these sampling events also informed a report published by USGS entitled *Assessment of Per- and Polyfluoroalkyl Substances in Water Resources of New Mexico, 2020-21*, which was prepared with the assistance and support of NMED.[16] In addition to the direct cost of such sampling efforts, New Mexico has also incurred related overhead costs (staff time, shipping, supply, travel, etc.), which are recoverable under Section 107. *See United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1503 (6th Cir. 1989) (holding that EPA's overhead expenses, including employee time, are indirect costs that are "part and parcel" of the removal action, and thus recoverable).

### B. Costs for Highland Dairy Removal Action

New Mexico has partially funded a removal action (in the colloquial sense) at Highland Dairy—owned by Art and Renee Schaap, and less than a mile from Cannon—to ensure the proper disposal of a herd of cattle that was grossly contaminated with PFAS. As detailed in the

---

[16] Travis, R.E. et al, *Assessment of per- and polyfluoroalkyl substances in water resources of New Mexico*, U.S. GEOLOGICAL SURVEY SCIENTIFIC INVESTIGATIONS REPORT (April 2024), https://doi.org/10.3133/sir20235129.

Depopulation and Removal Plan for Highland Dairy Cow Herd (Ex. 13 to the Kanner Decl.), Highland Dairy was forced to first quarantine, and later "depopulate" (*i.e.*, euthanize) portions of its herd of dairy cattle due to PFAS contamination emanating from Cannon through groundwater. Contaminated carcasses were disposed of on-site at a pre-existing pit that was lined with caliche clay, an impermeable form of clay (preventing the spread of PFAS further into the environment) that is naturally occurring in the area. *Id.* at 25. After composting there, Highland Dairy will—under State oversight—conduct sampling of impacted materials (the composted carcasses as well as any impacted environmental media) and, if PFAS are detected above state standards for site remediation, arrange for safe disposal at a RCRA Subtitle C (Hazardous Waste) landfill or incinerate the materials—again, under State oversight. *Id.* at 29-34.

Highland Dairy submitted an application for funding from the State's Hazardous Waste Emergency Fund in May 2022, which described in detail the contamination of its herd and land, and the need for funding for Highland Dairy's disposal (removal) activities. Highland Dairy Application for Funding (Ex. 14 to the Kanner Decl.). Under the authority of the NMHWA,[17] New Mexico contributed $850,000 to this removal action. Approved Request for Release of Hazardous Waste Emergency Funds to Provide Emergency Response for Removal and Disposal of PFAS Contaminated Livestock (Ex. 15 to the Kanner Decl.); Highland Dairy Invoice and Proof of Payment (Ex. 16 to the Kanner Decl.). This action, taken by Highland Dairy but funded by the State, constitutes a "removal" not only as an action to "cleanup or remov[e] released hazardous substances," but also as an action to "prevent, minimize, or mitigate damage to . . . the environment." 42 U.S.C. § 9601(23); *see also United States v. Lowe*, 118 F.3d 399, 403 (5th Cir.

---

[17] *See* NMSA 1978 § 74-4-8 (creating a "hazardous waste emergency fund" for "cleanup of hazardous substance incidents, disposal of hazardous substances and . . . the state's share of any response action taken under [CERCLA].").

1997) ("The term removal is aimed at *containing* and cleaning up hazardous substance releases.") (emphasis added, citing *Hardage*, 982 F.2d at 1448); *City of New York v. Exxon Corp.*, 633 F. Supp. 609, 614 (S.D.N.Y. 1986) ("[R]emoval" actions include those "intended for the short-term abatement of toxic waste hazards.").

### C.  Costs for State Oversight of Defendants' Response

As discussed extensively in other filings before this Court, Defendants' response to PFAS contamination at Cannon is subject to a permit issued to the base under the authority of the NMHWA and RCRA. *See* Mem. of Law in Opp. to the United States' Site-Specific Mot. to Dismiss, at 8-9 (Dkt. No. 4851). Pursuant to that permit, NMED employees regularly review and respond to reports submitted by Defendants regarding the Air Force's remedial efforts at Cannon, maintain public records regarding the site, attend public meetings hosted by Cannon personnel, and request additional information from Cannon personnel. *See, e.g.*, NMED Response to Site Investigation Report (Ex. 17 to the Kanner Decl.); NMED Response to Remedial Investigation Work Plan (Ex. 18 to the Kanner Decl.); NMED Request for Information (Ex. 19 to the Kanner Decl.).

In overseeing Cannon's remedial efforts the State has incurred more than $122,000 in costs, primarily for employee time, which are recoverable under Section 107. *E.g. United States v. E.I. Dupont De Nemours & Co. Inc.*. 432 F.3d 161, 179 (3d Cir. 2005) (holding that government oversight costs are recoverable "[i]n light of the plain meaning of the relevant CERCLA provisions, the overall statutory framework, the functional benefits of agency oversight, and the

overarching statutory objective of ensuring that those responsible for environmental harm are tagged with the cost of their actions.") (internal quotation marks and citation omitted). [18]

As also discussed in other filings, Cannon's RCRA permit is subject to an ongoing appeal by the United States. *United States v. New Mexico Env't Dep't et al.*, Case No. 22-2132 (10th Cir.). However, the United States has conceded that "the permit remains in effect during that suit." Opp'n to Mtn. for Prelim. Inj. and Cross Mtn. to Dismiss at 9 n.3, No. 2:20-cv-2115-RMG (D.S.C. Sept. 7, 2019) (Dkt. No. 33). But even setting aside the State's oversight authority under the permit, NMED's review and comment on Defendants' response actions and reports would nevertheless be recoverable response costs under Section 107.

Section 121 of CERCLA provides that during the performance of a cleanup under its authority, states must be afforded "substantial and meaningful involvement . . . in initiation, development, and selection of remedial actions to be undertaken in that State." 42 U.S.C. § 9621(f)(1). Specifically, CERCLA requires, among other things, "State involvement in decisions about whether to perform a preliminary assessment and site inspection," "State participation in the long-term planning process for all remedial sites within the State," and a "reasonable opportunity for States to review and comment on" various aspects of the cleanup. *Id.* Likewise, the Defense Environmental Restoration Program (relating to cleanups performed by the Department of Defense) requires that states have an opportunity to comment on *all* non-emergency response actions taken with respect to a release of hazardous substances at a military facility in the state. 10 U.S.C. § 2705(b).

---

[18] Neither is it material that the State's authority for this oversight stems from a permit issued under RCRA, rather than from CERCLA. *See, e.g.*, *United States v. Rohm and Haas Company*, 2 F.3d 1265, 1274–75 (3d Cir. 1993) ("[W]e fail to perceive any reason why Congress might have wished to make government oversight expenses recoverable if the government invoked CERCLA statutory authority, but not if it invoked RCRA.").

Thus, a state's oversight of response actions performed by others are an integral and essential part of any response actions taken within said state's borders (despite Defendants' frequent characterization that submission of such documents to the State is a "courtesy"). The provisions discussed above reflect principles of cooperative federalism that lie at the very heart of CERCLA (and many other federal environmental laws).[19] The recoverability of costs for such oversight activities was squarely addressed in *State of California ex rel. Deparmentt of Toxic Substances Control v. Celtor Chemical Corp.*:

> Given CERCLA's requirements that the State take an active role in the cleanup decisions even though it is not the agency actually controlling the cleanup, it is reasonable to conclude that its oversight costs are necessary to make these decisions, and are therefore recoverable as "removal" and "remedial" costs. Moreover, the Court has an obligation to construe CERCLA broadly to accomplish its remedial goals. The types of costs sought by the State fall comfortably within the statutory definitions of "removal" and "remedial" costs.

901 F. Supp. 1481, 1490 (N.D. Cal. 1995) (citation omitted).

### D. Costs for a Health Assessment

The State has also incurred costs for a voluntary health assessment for residents living at or near Cannon, which the State contracted to Eastern Research Group, Inc. ("ESG"). NMED News Release (Ex. 20 to the Kanner Decl.); Professional Services Contract with ESG (Ex. 21 to the Kanner Decl.). The purpose and goal of this work was to "continue an existing effort to conduct [PFAS] public health surveillance through blood sampling clinics/events . . . using systematic scientific collection and analysis methods to identify up to 33 different PFAS commonly found in

---

[19] *See Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 126 (2d Cir. 2010) ("'[S]tates play a critical role in effectuating the purposes of CERCLA.' . . . That role is not only critical, it is autonomous. For instance, the EPA must coordinate with an affected state before deciding on an appropriate remedial action . . . .") (quoting EPA's amicus brief); *see also* EPA, *The Superfund Amendments and Reauthorization Act (SARA)*, available at https://www.epa.gov/superfund/superfund-amendments-and-reauthorization-act-sara (the Superfund Amendment and Reauthorization Act of 1986 "increased State involvement in every phase of the Superfund program.").

[AFFF] . . . ." *Id.* at 10. Importantly, the associated laboratory work was performed consistent with EPA Method 1633. *Id.* Such costs are recoverable response costs because they were incurred in an effort to "monitor, assess, and evaluate the release." 42 U.S.C. § 9601(23). They are also separately recoverable under Section 107(a)(4)(D) of CERCLA, which holds potentially responsible parties liable for "the costs of any health assessment or health effects study carried out under section 9604(i) of this title." *Id.* § 9607(a)(4)(D). The referenced section of CERCLA clearly contemplates that states may perform such health assessments. *See* 42 U.S.C. § 9604(i)(6)(F) ("Any State or political subdivision carrying out a health assessment for a facility . . . .").[20]

### E. Costs for Natural Resource Damage Assessment

Finally, the State has incurred significant costs assessing natural resource damages at Cannon resulting from PFAS contamination. Not only are such costs recoverable as "response costs" (incurred for an action to "assess" and "evaluate" releases of PFAS at Cannon, *see* 42 U.S.C. § 9601(23)), they are also separately—and more specifically—recoverable under 42 U.S.C. § 9607(a)(4)(C) (liability for "the reasonable costs of assessing such injury, destruction, or loss [of natural resources] resulting from such a release.").[21]

---

[20] In its Complaint, New Mexico states that "New Mexico is also planning to conduct a medical monitoring program for residents at and around Cannon . . . The State expects to expend at least $870,000 on this effort." Second Am. Compl. ¶ 111(d) (Case No. 2:20-cv-02115, Dkt. No. 115). First, it should be noted that those costs are no longer future costs that would only be subject only to a declaratory judgment under 42 U.S.C. § 9613(g)(2)—they have now been expended, and so are directly recoverable under Section 107. Purchase Order for ESG Health Assessment (Ex. 22 to the Kanner Decl.).

Second, it should be noted that the response action for which these costs were incurred is better understood as a health assessment, rather than a "medical monitoring program," which would typically involve medical examinations. Section 104(i) defines "health assessments" to include "preliminary assessments of the potential risk to human health posed by individual sites and facilities" in order to determine "whether additional information on human exposure and associated health risks is needed and should be acquired by conducting epidemiological studies." 42 U.S.C. § 9604(i)(6)(F)-(G). This is consistent with the work done by ESG on behalf of the State, which merely collected blood samples and analyzed them for PFAS, and involved no medical examinations. Professional Services Contract with ESG, at 10-11 (Ex. 21 to the Kanner Decl.).

[21] Section 107 provides that "[i]n the case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) liability shall be to the United States Government and to any State for natural

As an example, the State's Office of the Natural Resources Trustee ("ONRT") has incurred costs for the preparation of a Preassessment Screen Determination for Cannon, in accordance with the United States Department of Interior's regulations. *See* 43 C.F.R. § 11.23-.25.[22] Preparation of the Preassessment Screen was contracted to Abt Associates Inc. by ONRT, and cost more than $75,000. Exemplar Abt Invoice and Proof of Payment (Ex. 23 to the Kanner Decl.). That study was completed in December 2024, and found that due to releases of PFOA and PFOS at Cannon, "natural resources for which New Mexico has trusteeship have been adversely affected, includ[ing] soil, groundwater, surface water and sediment, and potentially the biological resources that use these resources," and that Cannon's ongoing remedial efforts "will not sufficiently remedy the injury without further action." NRD Preassessment Screen at 43-44 (Ex. 24 to the Kanner Decl.).

## CONCLUSION

There are no genuine issues of material fact with respect to Defendants' liability under Section 107. Having established the necessary elements of proof by citing materials in the record, New Mexico is entitled to judgment as a matter of law. The State respectfully requests that the Court grant its Motion and enter an order finding Defendants liable for the State's incurred response costs, the amount of which will be determined in subsequent proceedings or in settlement.

---

resources within the State or belonging to, managed by, controlled by, or appertaining to such State." 42 U.S.C. § 9607(f)(1). Here, the injury lies primarily to groundwater at and around Cannon—the sole drinking water source for the region—which is held in trust by the State. *See* 42 U.S.C. § 9601(16) (defining "natural resources" to include land, fish, wildlife, biota, air, water, *ground water*, [and] *drinking water supplies*); *see also Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015) ("Article XX, Section 21 of our state constitution recognizes that a public trust duty exists for the protection of New Mexico's natural resources."). CERCLA requires each State to designate an official to act on behalf of the public as a trustee for natural resources, who shall assess damages to natural resources under their trusteeship for purposes of CERCLA (and the Clean Water Act). 42 U.S.C. § 9607(f)(2)(B). Accordingly, the State has enacted the Natural Resource Trustee Act, which establishes the Office of Natural Resources Trustee and charges it with  the assessment and collection of natural resource damages. NMSA §§ 75-7-2, 75-7-3(A)(5).

[22] Note that while a Preassessment Screen, as its name implies, is a mere determination of whether natural resource damage assessment is warranted, the costs for doing so is nevertheless recoverable under Section 107. 43 C.F.R. § 11.15(a)(3)(i).

24

New Mexico further requests declaratory judgment finding Defendants liable for future response costs and damages arising from the contamination at Cannon pursuant to Section 113(g)(2) of CERCLA. 42 U.S.C. § 9613(g)(2) ("In any action [under Section 107], the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.").

Dated: June 25, 2025                    Respectfully submitted,


                                        **RAÚL TORREZ, ATTORNEY GENERAL FOR THE STATE OF NEW MEXICO**

                                        **NEW MEXICO DEPARTMENT OF JUSTICE**

                                        /s/   William G. Grantham
                                        William G. Grantham
                                        Assistant Attorney General
                                        wgrantham@nmdoj.gov
                                        408 Galisteo St.
                                        Santa Fe, NM 87501
                                        Phone: (505) 717-3520

                                        *Counsel for the State of New Mexico and the New Mexico Office of Natural Resources Trustee*

                                        **NEW MEXICO ENVIRONMENT DEPARTMENT**

                                        /s/ Zachary Ogaz
                                        Zachary Ogaz
                                        General Counsel
                                        zachary.ogaz@env.nm.gov
                                        New Mexico Environment Department
                                        121 Tijeras Ave. NE
                                        Albuquerque, NM 87102
                                        Phone: (505) 222-9554
                                        Fax: (505) 383-2064

                                        *Counsel for the New Mexico Environment Department*

**KANNER & WHITELEY, LLC**

*/s/ Allan Kanner*_____

Allan Kanner
a.kanner@kanner-law.com
David Ivy-Taylor
d.ivy-taylor@kanner-law.com
Annemieke Tennis
a.tennis@kanner-law.com
701 Camp Street
New Orleans, LA 70130
Phone: (504) 524-5777

*Counsel for Plaintiffs the State of New Mexico, the New Mexico Environment Department, and the New Mexico Office of Natural Resources Trustee*

26

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 25, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record in this case via transmission of Notice of Electronic Filing generated by CM/ECF.

<u>/s/ Allan Kanner</u>
Allan Kanner
701 Camp Street
New Orleans, LA 70130
Phone: (504) 524-5777
